# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**
October 24, 2019

Lyle W. Cayce
Clerk

No. 18-50225

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

TONY SPARKS,

Defendant-Appellant.

Appeal from the United States District Court
for the Western District of Texas

Before ELROD, GRAVES, and OLDHAM, Circuit Judges.*

ANDREW S. OLDHAM, Circuit Judge:

Tony Sparks and his fellow gang members carjacked Todd and Stacie Bagley at gunpoint. The gang locked the Bagleys in the trunk for hours, emptied the Bagleys' bank account, and tried to pawn Stacie's wedding ring. During the gang's crime spree, the Bagleys sang gospel songs from the trunk and told their captors about Jesus. Eventually one of the gang members popped the trunk, cursed at the couple, and executed Todd in front of his wife. That same gang member shot Stacie in the face but failed to kill her. Others incinerated the car to destroy the evidence and burned Stacie alive.

---

* Judge Graves concurs in the judgment only.

No. 18-50225

For his role in this crime, Sparks received a below-Guidelines 35-year sentence. Sparks says that violates the Eighth Amendment. We disagree.

## I.

## A.

On June 20, 1999, Tony Sparks went to a convenience store in Killeen, Texas, with Christopher Vialva and Christopher Lewis.[1] The three of them were members of a local gang known as the 212 PIRU Bloods. They planned to dupe a Good Samaritan into giving them a ride before carjacking him or her at gunpoint. Sparks brought the gun, a .22 caliber pistol.

Police initially thwarted the plan by detaining the trio for violating the city's juvenile curfew law. (Sparks was 16 at the time.) Before being detained, Lewis threw the pistol into the bushes. Sparks's mother picked up Sparks and Lewis, and Vialva was released because he was an adult.

The following day, Sparks, Vialva, and Lewis regrouped. They recruited two other members of their gang, Brandon Bernard and Terry Brown, to help with the carjacking. Vialva and Bernard retrieved the .22 caliber pistol that Lewis had discarded the night before. Because it was wet with dew, they worried that it would not function. So Bernard obtained a Glock .40 caliber pistol to use for the carjacking.

That afternoon, the five gang members went to an IGA supermarket to find a carjacking victim. Bernard and Brown acted as lookouts while Sparks, Vialva, and Lewis approached potential victims to ask for a ride. No one offered them a ride, so they drove to a "Mickey's" convenience store. Bernard and Brown went to a nearby laundromat to play video games. Sparks, Vialva, and Lewis went to the front of the convenience store.

---

[1] We previously reported the factual background of this case in *United States v. Bernard*, 299 F.3d 467 (5th Cir. 2002). The factual recitation here comes principally from *Bernard*, as supplemented by Sparks's record.

No. 18-50225

Shortly after arriving at the convenience store, Sparks found Todd Bagley using a payphone outside. Todd and his wife Stacie were youth ministers from Iowa. They'd previously lived in Killeen because Todd was a veteran of the U.S. Army and had been stationed at Fort Hood. The young couple had gone to church at Grace Christian, where they worked with the youth group. They were back in Killeen on a vacation to see old friends and attend a revival meeting at the church.

Sparks approached Todd and asked if he would give Sparks, Vialva, and Lewis a ride to another location. Todd conferred with Stacie, and the young couple unsuspectingly agreed to give the gang members a ride. Bernard and Brown returned to their homes to wait for further instructions from Vialva.

Sparks, Vialva, and Lewis got into the back seat of the Bagleys' car. Todd drove while his wife sat in the front passenger seat. In accordance with their plan, Sparks and Vialva pulled out two handguns, and Vialva pointed his gun at Todd. Vialva told the Bagleys that the "plan had changed," and he forced Todd to drive to a semi-rural location near the edge of Killeen. While Vialva pointed a gun at the Bagleys, Sparks and Vialva robbed them of their money, wallets, purse, debit card, identification, and jewelry. Vialva demanded their bank account's pin number and then forced the Bagleys into the trunk of their car.

With the Bagleys locked in the trunk, Sparks, Vialva, and Lewis went on an hours-long crime spree. They went to an ATM to steal all of the Bagleys' money. That effort was frustrated, however, because the youth ministers had less than $100 in their bank account. They tried to pawn Stacie's wedding ring. They used what little money they could steal from the Bagleys to buy cigars, cigarettes, and fast food from Wendy's.

Meanwhile, the Bagleys evangelized from the trunk. According to Lewis (who later testified), the Bagleys asked him and Sparks about God, Jesus, and

church. The Bagleys acknowledged not having earthly wealth, but they told their captors that faith in Jesus is more valuable than money. The Bagleys talked about the revival meeting at Grace Christian. And the Bagleys urged their captors to have faith in Jesus Christ. The Bagleys begged for their lives.

As night began to fall, Sparks told the gang that he needed to go home to avoid violating his 8 p.m. probation curfew for a previous robbery conviction. The group dropped Sparks off at his home. Sparks took the Bagleys' jewelry with him. But Vialva asked Sparks not to take his .22 caliber handgun. After initially refusing, Sparks agreed.

Bernard and Brown purchased fuel to burn the Bagleys' car. Vialva and Lewis picked them up, and the four gang members drove (again, with the Bagleys still locked in the trunk) to the Belton Lake Recreation Area on the Fort Hood military installation. Vialva parked the Bagleys' car on top of a little hill. Brown and Bernard poured lighter fluid on the interior of the car. All the while, the Bagleys sang and prayed in the trunk.

Stacie's last words were "Jesus loves you," and "Jesus, take care of us." Vialva crudely cursed at her, told Lewis to pop the trunk, and then executed Todd in front of his wife. Vialva shot Todd in the head with the .40 caliber Glock, killing him instantly. Then Vialva shot Stacie in the face but failed to kill her. Bernard set the car on fire and burned Stacie alive. Todd was 26. Stacie was 28.

## B.

Sparks pleaded guilty to aiding and abetting a carjacking, and he hoped to receive an offense-level reduction for acceptance of responsibility. U.S.S.G. § 3E1.1. But as he was awaiting sentencing, Sparks was implicated in a plot to escape from his detention center. As Sparks himself acknowledges, another inmate, Christopher Kirvin, choked a prison guard unconscious and stole her keys. The Pre-Sentence Report ("PSR") implicated Sparks based on a witness

who heard Sparks planning the escape attempt with Kirvin. Sparks flushed a toilet repeatedly during the assault to mask the sound of the prison guard's screams. Based on the escape attempt, the PSR added two points to Sparks's offense level for obstructing justice. *Id.* § 3C1.1. It also denied Sparks an offense-level reduction for accepting responsibility. *Id.* § 3E1.1. Given the nature of the crime and the Bagleys' murders, the PSR recommended an offense level of 45—two levels above the highest value on the sentencing table.

When the district court sentenced Sparks in 2001, it agreed with the PSR's factual findings and sentencing calculation. Applying the Guidelines, which were mandatory before *United States v. Booker*, 543 U.S. 220 (2005), the court sentenced Sparks to life in prison without the possibility of parole ("LWOP").

We affirmed Sparks's sentence on direct appeal. *See United States v. Sparks*, 31 F. App'x 156 (5th Cir. 2001). In 2003, Sparks filed a pro se motion under 28 U.S.C. § 2255 to vacate his sentence, and the district court denied it. Sparks filed an appeal, but we dismissed it for want of prosecution. *United States v. Sparks*, No. 03-50781 (5th Cir. Nov. 19, 2003).

Since then, several Supreme Court decisions involving the Eighth Amendment raised constitutional concerns about Sparks's LWOP sentence. In *Graham v. Florida*, 560 U.S. 48 (2010), the Court held that juveniles may not be sentenced to life without parole for non-homicide offenses. In *Miller v. Alabama*, 567 U.S. 460 (2012), the Court held that juveniles may not receive mandatory sentences of life without parole. And in *Montgomery v. Louisiana*, 136 S. Ct. 718 (2016), the Court made *Miller* retroactive to cases on collateral review.

We authorized Sparks to file a successive § 2255 motion based on *Graham. In re Sparks*, 657 F.3d 258, 262 (5th Cir. 2011). The district court denied the motion. But we granted a certificate of appealability, *United States*

*v. Sparks*, No. 13-50807 (5th Cir. July 10, 2014), and remanded the case for reconsideration at the Government's request, *United States v. Sparks*, No. 13-50807 (5th Cir. Feb. 10, 2015). We also authorized Sparks to file a successive § 2255 motion based on *Miller*, which the Government did not oppose. *In re Sparks*, No. 16-50973 (5th Cir. Nov. 18, 2016).

Upon joint motion of the parties, the district court consolidated the motions and ordered a resentencing. It provided Sparks with court-appointed experts and conducted a five-day sentencing hearing. At the hearing, the Government introduced evidence that Sparks committed repeated acts of brutal violence during his first decade in prison. In 2004, Sparks participated in a riot involving approximately 600 inmates, carrying a baseball bat during the fighting. In July 2006, Sparks stabbed his cellmate 12 times in the back, neck, head, and right arm. In September 2007, he stabbed another inmate in the neck, resulting in a spinal cord injury that left the inmate unable to walk or urinate by himself. In March 2008, Sparks attempted to murder an inmate by stabbing him repeatedly in the head, resulting in brain damage and the loss of the victim's right eye. Sparks's violence led to his transfer to ADX Florence in Colorado, a supermax facility where the nation's most dangerous federal prisoners are located. Before that transfer, he had been sanctioned for at least 23 incidents. And in 2014, Sparks instructed two inmates to assault another inmate.

The district court carefully examined Sparks's youth and its attendant characteristics in a twenty-six-page memorandum opinion. The district court included a thorough discussion of *Miller* and the 18 U.S.C. § 3553(a) factors. The court also considered the PSR, which could not identify any basis under § 3553(a) for varying from the recommended sentence of life imprisonment. The district court could not "imagine a worse offense, nor [could] the court imagine a more callous perpetrator than the defendant." Nonetheless, the

No. 18-50225

district court chose to vary downward and sentenced Sparks to 35 years, with credit for time in custody. Sparks appealed.

II.

Sparks's principal argument on appeal is that the district court violated *Miller v. Alabama*. That case held the Eighth Amendment prohibits mandatory LWOP sentences for juveniles. *Miller*, 567 U.S. at 465. It's not clear from Sparks's briefs whether he thinks his below-Guidelines sentence violates the substantive or procedural aspects of the *Miller* decision. At argument, his counsel urged us to consider both. We do so.

A.

*Miller* announced a substantive Eight Amendment rule: The Constitution prohibits sentencing a juvenile to *mandatory* LWOP because it "poses too great a risk of disproportionate punishment." 567 U.S. at 479. But *Miller* did "not consider" whether "the Eighth Amendment requires a categorical bar on life without parole for juveniles." *Ibid.*

Three corollaries follow from *Miller*'s substantive rule. First, it "did not foreclose a sentencer's ability to impose life without parole" on a *discretionary* basis. *Montgomery*, 136 S. Ct. at 726; *see also Miller*, 567 U.S. at 483. Our sister circuits' post-*Miller* decisions recognize as much. *See Contreras v. Davis*, 716 F. App'x 160, 163 (4th Cir. 2017); *Kelly v. Brown*, 851 F.3d 686, 687–88 (7th Cir. 2017); *United States v. Jefferson*, 816 F.3d 1016, 1019 (8th Cir. 2016); *Davis v. McCollum*, 798 F.3d 1317, 1320–21 (10th Cir. 2015); *Croft v. Williams*, 773 F.3d 170, 171 (7th Cir. 2014); *Evans-Garcia v. United States*, 744 F.3d 235, 241 (1st Cir. 2014); *Bell v. Uribe*, 748 F.3d 857, 869–70 (9th Cir. 2014); *United States v. Reingold*, 731 F.3d 204, 214 (2d Cir. 2013).[2] Numerous state courts have reached

---

[2] The Fourth Circuit in *Malvo v. Mathena*, 893 F.3d 265 (4th Cir. 2018), held that *Montgomery* expanded *Miller* to cover discretionary LWOP sentences. *Id.* at 273–74. The Supreme Court granted certiorari. 139 S. Ct. 1317 (2019) (mem.).

the same conclusion. *See, e.g.*, *Lucero v. People*, 394 P.3d 1128, 1132 (Colo. 2017); *Conley v. State*, 972 N.E.2d 864, 879 (Ind. 2012); *State v. Russell*, 908 N.W.2d 669, 676 (Neb. 2018); *Jones v. Commonwealth*, 795 S.E.2d 705, 722 (Va. 2017). Thus, if a sentencing court has the option to choose a sentence other than life without parole, it can choose life without parole without violating *Miller*.

Second, *Miller* has no relevance to sentences less than LWOP. *See United States v. Walton*, 537 F. App'x 430, 437 (5th Cir. 2013) (per curiam). This means that sentences of life *with* the possibility of parole or early release do not implicate *Miller*. *See Bowling v. Dir., Va. Dep't of Corr.*, 920 F.3d 192, 197 (4th Cir. 2019); *Goins v. Smith*, 556 F. App'x 434, 440 (6th Cir. 2014); *Lucero*, 394 P.3d at 1132; *Lewis v. State*, 428 S.W.3d 860, 863–64 (Tex. Crim. App. 2014). Nor do sentences to a term of years. *See Walton*, 537 F. App'x at 437; *United States v. Morgan*, 727 F. App'x 994, 997 (11th Cir. 2018) (per curiam); *United States v. Lopez*, 860 F.3d 201, 211 (4th Cir. 2017); *Lucero*, 394 P.3d at 1133. All of these sentences can be imposed on a mandatory basis for juveniles without implicating *Miller* because they are not LWOP sentences.

Third, a term-of-years sentence cannot be characterized as a *de facto* life sentence. *Miller* dealt with a statute that specifically imposed a mandatory sentence of life. The Court distinguished that sentencing scheme from "impliedly constitutional alternatives whereby 'a judge or jury could choose, rather than a life-without-parole sentence, a lifetime prison term *with* the possibility of parole or a lengthy term of years.'" *Lucero*, 394 P.3d at 1133 (quoting *Miller*, 567 U.S. at 489). Given *Miller*'s endorsement of "a lengthy term of years" as a constitutional alternative to life without parole, it would be bizarre to read *Miller* as somehow foreclosing such sentences.

A panel of the Third Circuit nevertheless tried. *See United States v. Grant*, 887 F.3d 131 (3d Cir. 2018), *reh'g en banc granted, opinion vacated*, 905 F.3d 258 (3d Cir. 2018). In *Grant*, the panel sought to "effectuate" *Miller* by

inventing a "rebuttable presumption" that a juvenile offender "should be afforded an opportunity for release before the national age of retirement." *Id.* at 152–53. The panel conceded it had no "principled basis" for drawing that line. *Id.* at 150. The panel further conceded it couldn't be sure what line it was drawing: "We cannot say with certainty what the precise national age of retirement is, as it is a figure that incrementally fluctuates over time." *Id.* at 151. It also admitted that reliance on a "national retirement age" would fail to account for "locality, state, gender, race, wealth, or other differentiating characteristics." *Ibid.* The panel went on to discuss the history of Social Security, Gallup polls, and one academic study before pronouncing a "national retirement age" of sixty-five. *Id.* at 151–52. But even in its pronouncement of the rule, the panel appeared to recognize the arbitrariness of its decision: "Without definitively determining the issue, we consider sixty-five as an adequate approximation of the national age of retirement to date. However, district courts retain the discretion to determine the national age of retirement at sentencing, and remain free to consider evidence of the evolving nature of this estimate." *Id.* at 152. Such reasoning is not bound by law.

Sparks cannot show a substantive *Miller* violation. First, he received a discretionary sentence under § 3553(a) rather than a mandatory sentence. Second, he was sentenced to thirty-five years in prison rather than life without parole. Because Sparks did not receive a mandatory sentence of life without

parole, he has failed to demonstrate a violation of *Miller*'s substantive requirements.[3]

### B.

The procedural component of *Miller* "requires a sentencer to consider a juvenile offender's youth and attendant characteristics before determining that life without parole is a proportionate sentence." *Montgomery*, 136 S. Ct. at 734. In *Miller* and *Montgomery*, the Supreme Court considered state laws in Alabama and Louisiana imposing mandatory LWOP sentences on juveniles. But *federal* prisoners have procedural protections that state prisoners do not have—namely, the sentencing factors in § 3553(a) and the advisory Sentencing Guidelines.

Under § 3553(a), a sentencing court "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. In choosing an appropriate sentence, the court must examine "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). It must also consider the policy statements of the Sentencing Commission, *id.* § 3553(a)(5), which expressly allow for consideration of the defendant's age, "including youth," U.S.S.G. § 5H1.1, p.s.

The § 3553(a) analysis satisfies *Miller*'s procedural requirement that the court consider the defendant's youth and its attendant characteristics before imposing a sentence of life without parole. *See Moore v. United States*, 871 F.3d 72, 79 (1st Cir. 2017); *Lopez*, 860 F.3d at 211; *Jefferson*, 816 F.3d at 1018 n.3

---

[3] It is unclear whether Sparks also intended to challenge the substantive reasonableness of his sentence under *Gall v. United States*, 552 U.S. 38 (2007). The issue is not adequately briefed, but even if it were, Sparks has failed to show an abuse of discretion. *Id.* at 51. Sparks has a remarkable history of violence in prison. Even so, the district court varied down from the Guidelines, sentencing him to 35 years. Sparks has not rebutted the presumption that his below-Guidelines sentence is reasonable. *See United States v. Simpson*, 796 F.3d 548, 557 (5th Cir. 2015).

(noting that the "Supreme Court has not yet applied its constitutional decision in *Miller* to a life sentence imposed by a federal court," and questioning *Miller*'s applicability to a sentence imposed under the advisory Guidelines). Thus, a sentence that satisfies § 3553(a)'s procedural requirements cannot be challenged under the procedural component of the *Miller* decision.

Reflecting some confusion over the procedural requirements of *Miller*, the district court's opinion contains separate discussions of *Miller* and § 3553(a). Other courts have similarly treated the so-called "*Miller* factors" as separate from the § 3553(a) factors. *See, e.g.*, *United States v. Orsinger*, 698 F. App'x 527, 527 (9th Cir. 2017) (per curiam) (noting that the district court considered the evidence in "light of the factors identified in *Miller* and in 18 U.S.C. § 3553(a)"); *United States v. Garcia*, 666 F. App'x 74, 78 (2d Cir. 2016) (per curiam) (referring to "*Miller* and § 3553(a) factors" as separate and distinct); *United States v. Guzman*, 664 F. App'x 120, 122 (2d Cir. 2016) (per curiam) (noting that the district court "gave ample consideration to each of the *Miller* factors, together with the sometimes-overlapping § 3553(a) factors"); *United States v. Guerrero*, 560 F. App'x 110, 112 (2d Cir. 2014) (per curiam) (holding that the "district court properly considered all of the *Miller* factors . . . and other mitigating factors under 18 U.S.C. § 3553(a)"), *aff'g United States v. Maldonado*, No. 09-CR-339-02, 2012 WL 5878673, at *9 (S.D.N.Y. Nov. 21, 2012) (discussing "*Miller* factors" separately from § 3553(a) factors).

In a recent en banc opinion, the Ninth Circuit vacated a sentence imposed under § 3553(a) after hearing "evidence related to a number of the *Miller* factors" because the district court's "sentencing remarks focused on the punishment warranted by the terrible crime Briones participated in, rather than whether Briones was irredeemable." *United States v. Briones*, 929 F.3d 1057, 1066 (9th Cir. 2019) (en banc). Though the Ninth Circuit claimed not to hold that "the district court erred simply by failing to use any specific words,"

*id.* at 1067, that appears to be exactly what the court did, *see id.* at 1073 (Bennett, J., dissenting). We reject the view that a procedurally proper sentence imposed under § 3553(a) can be vacated merely because the district court failed to quote certain magic words from the Supreme Court's *Miller* decision. As the Court has clearly said, "*Miller* did not require trial courts to make a finding of fact regarding a child's incorrigibility." *Montgomery*, 136 S. Ct. at 735. The Court was "careful to limit the scope of any attendant procedural requirement to avoid intruding more than necessary upon the States' sovereign administration of their criminal justice systems." *Ibid.* Hence, the Court reiterated, "*Miller* did not impose a formal factfinding requirement." *Ibid.*

In this case, the district court appointed taxpayer-funded experts for Sparks, held a lengthy five-day hearing, and wrote twenty-six pages explaining its sentence. This fulsome process gave Sparks far more than the minimum procedure necessary to conduct a proper § 3553(a) analysis. And we agree with the Government that *Miller* does not add procedural requirements over and above § 3553(a).

### III.

Sparks also argues that the district court erred in calculating the offense level under the Guidelines. The district court increased Sparks's offense level by two points for obstructing justice, U.S.S.G. § 3C1.1, and denied him a two-point reduction for accepting responsibility, *id.* § 3E1.1. Those decisions were based on the court's finding that Sparks attempted to escape from his detention center. Sparks claims he was not involved in the attempt.

We review the district court's factual findings for abuse of discretion, which occurs when the court relies on "clearly erroneous facts." *Gall*, 552 U.S. at 51. "Generally, a PSR 'bears sufficient indicia of reliability to be considered as evidence by the sentencing judge in making factual determinations.'" *United States v. Harris*, 702 F.3d 226, 230 (5th Cir. 2012) (quoting *United States v.*

*Nava*, 624 F.3d 226, 231 (5th Cir. 2010)). A district court may adopt facts contained in the PSR "without further inquiry" if those facts have an "adequate evidentiary basis with sufficient indicia of reliability." *Ibid.* (quoting *United States v. Trujillo*, 502 F.3d 353, 357 (5th Cir. 2007)).

Sparks's PSR contains reliable evidence that he tried to escape from his detention center. That evidence includes an interview with a witness who heard Sparks discussing the escape plan with another inmate, Christopher Kirvin. The witness said that when Kirvin attacked a prison guard, Sparks repeatedly flushed a toilet to mask the sound of her screams. Sparks also admitted to a probation officer that he participated in the escape attempt. The district court reasonably relied on the PSR.

\* \* \*

Sparks's sentence is AFFIRMED.

13