19-2158-cr
United States of America v. Portillo

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2020

Submitted:  August 17, 2020          Decided: November 24, 2020

Docket No. 19-2158

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,

APPELLEE,

V.

JOSUE PORTILLO,

DEFENDANT - APPELLANT.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Before:  NEWMAN, POOLER, *Circuit Judges*.[1]

Appeal from a judgment of the District Court for the Eastern District of New York (Joseph F. Bianco, then-District Judge) imposing a sentence of fifty-five years on a juvenile fifteen years of age at the time of an offense involving four murders.

Judgment affirmed.

---

[1] Circuit Judge Peter W. Hall, originally a member of the panel, is currently unavailable. The appeal is being decided by the remaining members of the panel, who are in agreement. *See* 2d Cir. IOP E(b).

Joseph W. Ryan, Jr., Melville Law Center, Melville, NY, for Defendant-Appellant Josue Portillo.

Paul G. Scotti, Asst. U.S. Atty., Brooklyn, NY (Richard P. Donoghue, U.S. Atty. for the Eastern District of New York, David C. James, John J. Durham, Asst. U.S. Attys., Brooklyn, NY, on the brief), for Appellee United States of America.

JON O. NEWMAN, *Circuit Judge*:

This appeal, challenging as unreasonably severe a sentence of fifty-five years imposed on a defendant who was fifteen years old at the time of the offense, presents the legal issue of the lawfulness of the sentence and also serves as a classic illustration of the unfortunate consequences of the congressional decision to eliminate parole in the Sentencing Reform Act of 1984.[2] Defendant-Appellant Josue Portillo appeals from the July 12, 2019, judgment entered in the United States District Court for the Eastern District of New York (Joseph F. Bianco, then-District Judge). Pursuant to a guilty plea, Portillo was convicted of participating in a pattern of racketeering activity evidenced by his role in the murder of four teenagers, in violation of 18 U.S.C. § 1962(c).

---

[2] Comprehensive Crime Control Act of 1984, Pub. L. No. 98-473, tit. II, § 218(a)(5), 98 Stat. 1837, 2027 (repealing 18 U.S.C. §§ 4201-08).

On appeal, Portillo makes two arguments. First, he urges an extension of the Supreme Court's decision in *Miller v. Alabama*, 567 U.S. 460 (2012), that would require the District Court at sentencing in this case to consider the factors that *Miller* ruled must be considered in sentencing a juvenile to life imprisonment without the possibility of parole. Second, he contends that his sentence was substantively "unreasonable," the standard the Supreme Court instructed federal appellate courts to use on review of sentences, *see United States v. Booker*, 543 U.S. 220, 260-64 (2005), after the Court determined in 2005 that the federal Sentencing Guidelines, which had become effective in 1987, were no longer mandatory, *see id*. at 245, 259-60.

We conclude that the challenged sentence was lawfully imposed and therefore affirm the judgment. We also add some observations on the relationship between this sentence and the unavailability of parole.

Background

*The crime*. In April of 2017, Portillo was fifteen years and eleven months old and a member of the MS-13 gang when he participated in the execution-style murders of four members of a rival gang. The original plan was to kill a person identified as "Witness 1," with whom Portillo had had a previous altercation. Portillo and other MS-13 members instructed two females to invite Witness 1 to a

public park in Central Islip, New York, to smoke marijuana. After learning that Witness 1 had invited four others to accompany him, Portillo and members of his gang decided to kill all five, believing that all of them were members of the rival gang.

Portillo sought and obtained a gang leader's approval to commit the murders. He, along with several gang members, surrounded the suspected rival gang members and, after Witness 1 escaped, killed the remaining four, using machetes, an ax, knives, and tree limbs. Portillo wielded a machete.

*Litigation procedure.* The Government initially filed a juvenile information, charging Portillo with conspiracy to murder and the substantive offense of murder, in violation of 18 U.S.C. § 1962(c), and several related offenses. The Government then moved to transfer Portillo to adult status, pursuant to 18 U.S.C. § 5032. At a hearing on that motion, the District Judge considered reports from a forensic psychiatrist and a rehabilitation program to which Portillo had been referred after the murders, and also heard testimony from the psychiatrist. The reports and testimony informed the District Judge of Portillo's troubled home life and his association with MS-13 one month after arriving in the United States from El

4

Salvador. The District Court granted the Government's motion. *See United States v. Juvenile Male*, 327 F. Supp. 3d 573 (E.D.N.Y. 2018).

Portillo waived indictment and pled guilty to a superseding information charging him with a substantive violation of section 1962(c), based on the four murders. The Probation Department's presentence report calculated a Sentencing Guidelines range of life imprisonment and recommended that sentence. The Government recommended a sentence of sixty years.

The District Court sentenced Portillo to a term of fifty-five years, using the post-*Booker* discretion to impose a nonGuidelines sentence. Judge Bianco provided an extensive explanation of his reasons.

The District Judge also provided a comprehensive explanation for the sentence in his written Statement of Reasons.

## Discussion

I. Lawfulness of the Sentence

*Application of Miller*. In *Miller*, the Supreme Court considered two cases presenting Eighth Amendment challenges to mandatory sentences of life imprisonment without the possibility of parole, imposed on defendants who were fourteen years old at the time of their crimes. Each was convicted under statutes

punishing those responsible for a murder. The Court stated: "We . . . hold that mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'" *Id*. at 465. The reason the mandatory nature of the sentence violated the Eighth Amendment, the Court explained, was that it precluded the sentencing judge's consideration of several factors ("*Miller* factors"): the juvenile's "chronological age and its hallmark features–among them, immaturity, impetuosity, and failure to appreciate consequence"; "the family and home environment that surrounds" the juvenile; "the circumstances of the homicide offense, including the extent of his participation in the conduct"; "the way familial and peer pressures may have affected him"; and "the possibility of rehabilitation." *Id*. at 477. Four years later, in *Montgomery v. Louisiana*, 136 S. Ct. 718 (2016), in deciding whether *Miller* must be applied retroactively, the Court stated: "In *Miller*, the Court held that a juvenile convicted of a homicide offense could not be sentenced to life in prison without parole absent consideration of the juvenile's special circumstances in light of the principles and purposes of juvenile sentencing." *Id*. at 725. The Court also stated, "*Miller* requires that before sentencing a juvenile to life without parole, the sentencing judge take into account 'how children are

6

different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.'" *Id*. at 733 (quoting *Miller*, 567 U.S. at 480).

In the pending appeal, the sentence, although severe, is not life imprisonment and was not required to be imposed. Nevertheless, Portillo contends that *Miller* should be extended to require that a judge, exercising discretion to impose on a juvenile a sentence of such severity as fifty-five years without the possibility of parole, must consider the factors identified in *Miller*.

We will assume, for purposes of this appeal, that the District Court was required to consider the *Miller* factors in determining that a sentence of fifty-five years, not subject to parole, was warranted for a defendant fifteen years old at the time of the homicide crimes. Even with this assumption, we are satisfied that Judge Bianco, perhaps anticipating the possible application of the *Miller* factors to the sentencing task before him, gave thoughtful consideration to all of these factors. Noting that he had reread the *Miller* opinion, he noted at the sentencing hearing what he understood were his obligations:

> "[T]he court should consider, among other factors, the defendant's chronological age and characteristics, including any immaturity, impetuosity and failure to appreciate the risks and consequences. The court should consider the family and home environment that surround the defendant. The court should consider the circumstances of the offense including the extent of the juvenile's participation and the

conduct and the way familial and peer pressures may have affected him and the possibility of rehabilitation."

A 245-46

Portillo contends that the District Judge "rejected" the *Miller* factors. Br. for Appellant 11. On the contrary, as both the sentencing transcript and the District Court's written Statement of Reasons make clear, Judge Bianco recognized the relevance of these factors, and departed downward from the Guidelines in part because of Portillo's age, but reasonably concluded, after considering the *Miller* factors, that a further departure was not warranted.

*Substantive reasonableness*. We review a district court's sentence under a "deferential abuse-of-discretion standard," *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (internal quotation marks and citation omitted), and "our review of a sentence for substantive reasonableness is particularly deferential," *United States v. Broxmeyer*, 699 F.3d 265, 289 (2d Cir. 2012). We have analogized substantive unreasonableness to the "manifest injustice" and "shocks the conscience" standards applicable in other contexts. *United States v. Rigas*, 583 F.3d 108, 122-23 (2d Cir. 2009).

A sentence of fifty-five years is unquestionably severe. And it is fairly deemed especially harsh for a defendant fifteen years of age at the time of the

8

crime. At the same time, the offense for which this sentence was imposed is heinous, indeed, especially heinous. Four people were murdered, the killing was brutally accomplished, and the defendant not only actively participated in the murders but planned the crime in retaliation for a petty grievance. Acknowledging the broad scope of a sentencing judge's discretion and taking into account the care taken by Judge Bianco in exercising that discretion, we conclude that the sentence is not unreasonable in any legally cognizable sense.

## II. Unavailability of Parole

We now consider the significance of the unavailability of parole with respect to Portillo's case and begin with an account of how that unavailability came about.

Parole is the release of a sentenced prisoner before the completion of a sentence. Although those sentenced for committing crimes sometimes have their sentences reduced to a limited extent by good behavior during confinement,[3] parole can reduce the duration of imprisonment by a substantial amount and reflects an

---

[3] Federal prisoners sentenced to a term exceeding one year can earn so-called "good-time credits" of up to fifty-four days for each year of the sentence for "exemplary compliance with institutional disciplinary regulations." 18 U.S.C. § 3624(b). Good time credits were first authorized for federal prisoners in 1875, and were set at ten days per months from 1910 until the Sentencing Reform Act reduced the rate to fifty-four days per year. *See* 18 U.S.C. § 4161 (1982) (repealed effective 1987); s*ee also* Kate Stith & Steven Y. Koh, *The Politics of Sentencing Reform: The Legislative History of the Federal Sentencing Guidelines*, 28 Wake Forest L. Rev. 223, 226, n.10 (1993).

aggregate assessment of not only the prisoner's conduct in prison but also his or her prospects for leading a law-abiding life upon release.

In the federal criminal justice system, the use of parole began in 1910,[4] when parole boards were established at three federal penitentiaries.[5] The United States Board of Parole, renamed the United States Parole Commission in 1976,[6] began making parole release decisions in 1930.[7] In 1986, the year before the Sentencing Reform Act became effective,[8] 8,749 federally sentenced defendants were paroled.[9] Two types of parole eligibility were available. Typically, a federal prisoner, sentenced to more than one year, was eligible for parole after serving one-third of the sentence.[10] Alternatively, a sentencing judge had the discretion to make such a federal prisoner eligible for parole at any time.[11]

---

[4] Act of June 25, 1910, ch. 387, 61st Cong., 2d Sess., § 1, 36 Stat. 819.

[5] Peter B. Hoffman, *History of the Federal Parole System* 1 (May 2003), http://www.fedcure.org/information/TheHistoryOfTheFederalParoleSystem-2003.pdf.

[6] *See* Parole Commission and Reorganization Act, Pub. L. 94-233, § 2, 90 Stat. 219 (1976) (codified at 18 U.S.C. § 4202) (repealed effective 1987).

[7] Hoffman, *supra*, n.4, at 1.

[8] Sentencing Reform Act § 235(a)(1).

[9] See U.S. Dept. of Justice, Bureau of Justice Statistics Bulletin, Probation and Parole 1986, Table 2, Entries, 1986 (Dec.1987), bjs.gov/index.cfm?ty=pbdetail&iid=3623.

[10] *See* 18 U.S.C. § 4205(a) (repealed effective 1987). A prisoner serving a life sentence or any sentence longer than thirty years was eligible for parole after ten years. *See id*.

[11] *See* 18 U.S.C. 4205(b)(2) (repealed effective 1987). Some judges imposed a long sentence with the expectation that public awareness of its length would have a deterrent effect on potential law violators and at the same time invoked subsection 4205(b)(2) so that the defendant could be released before the one-third point, an event unlikely to attract public attention.

In the years leading up to 1987, a combination of reform-minded legislators and criminal law scholars advocated sentencing reform, primarily to lessen sentence disparity, and incidentally to abolish parole.[12] Although some of them had come to doubt that rehabilitation was occurring during imprisonment with sufficient frequency to justify a system of early release on parole, their principal reason for eliminating parole was to achieve what was called "truth in sentencing."[13] They wanted a thirty-year sentence to mean thirty years (less the slight reduction for good time credits), not the ten-year term that would result from release at the one-third point.

Those advocating what was considered sentencing reform joined forces with those favoring increased severity of sentences,[14] and both sides found common ground in the concept of a system of sentencing guidelines, designed to reduce sentencing disparity. Their joint efforts produced the Sentencing Reform Act,[15] which became effective on October 1, 1987.[16]

---

[12] See Michael Tonry, *Federal Sentencing "Reform" since 1984: The Awful as Enemy of the Good*, 44 Crime & Just. 99, 105-06 (2015); Kate Stith & José A. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 38-48 (1998).

[13] Tonry, *supra* n.12, at 152.

[14] Some evidence of the differing views of those leading the legislative effort is the fact that Senator Edward M. Kennedy and Senator J. Strom Thurmond, Sr. were the co-sponsors of the bill that was a precursor of the Sentencing Reform Act. *See* S. 1630, 97th Cong., 1st Sess. (1981).

[15] Comprehensive Crime Control Act of 1984, Pub. L. 98-473, tit. II, 98 Stat. 2027 (1984).

[16] Sentencing Reform Act § 235(a)(1).

Our concern is the consequences of the provision of the Sentencing Reform Act that eliminated parole.[17] First, we note that ending parole did not achieve the expected "truth in sentencing." The reason is that federal court criminal cases are less than one percent of state court criminal cases,[18] and, although some states have ended or curtailed parole, many have retained it, and the American public frequently reads, hears, or sees reports of state prisoners released on parole. Such reports gain notoriety if the paroled prisoner commits another crime. The prevalence of parole in state criminal justice systems has substantially diminished the possibility that the public would understand that federal sentences will be served in full.

Second, the elimination of parole contributed significantly to achieving one objective of many of the proponents of the Sentencing Reform Act, the substantial

___

[17] *Id*. § 218(a)(5). Parole was not entirely eliminated. It remains available for prisoners sentenced before Oct. 1, 1987. Even without parole, a federal prisoner can be released at an early date if a President exercises an aspect of the constitutional pardon power by commuting a sentence, *i.e.*, reducing its length. "The President . . . shall have the power to grant reprieves and pardons for offenses against the United States, except in cases of impeachment." U.S. Const., art II, § 2. Presidential commutation of a federal sentence, occurs infrequently, however, averaging fifty-six a year since 1900. *See* Office of the Pardon Attorney, Clemency Statistics, https://www.justice.gov/pardon/clemency-statistics.

[18] Comparing the 87,149 federal criminal cases filed in 2018, *see* U.S. District Courts--Judicial Business 2018, U.S. Cts., https://www.uscourts.gov/statistics-reports/us-district-courts-judicial-business-2018, with the approximately 17,000,000 state court criminal cases filed in 2018, *see* Court Statistics Project, Nat'l Ctr. for State Courts, *State Court Caseload Digest 2018 Data* 3, https://www.courtstatistics.org/data/assets/pdf_file/0014/40820/2018-Digest.pdf yields a percentage of .005.

lengthening of the time served by federal prisoners. The average time served by all federal prisoners in 1986, the year before the repeal of parole became effective, was 14.6 months;[19] in 2012, it was 37.5 months.[20]

Third, and of particular pertinence to a case like Portillo's, the elimination of parole means that this defendant, now nineteen years old, will serve his fifty-five year sentence until he is seventy-one years old (or slightly younger depending on the good time credits he earns in prison).[21] We have ruled that the seriousness of his crime, considered along with his age and personal circumstances, permits that result. But if parole were available, there would be two consequences worth considering. On the one hand, Portillo's custodians would have an effective means of encouraging his observance of prison regulations, resulting from his awareness that misconduct would jeopardize any hope of parole. On the other hand, Portillo

---

[19] *See* U.S. Dept. of Justice, Bureau of Justice Statistics, *Federal Criminal Case Processing, 1982-93*, Table 18 (May 1996), bjs.gov/content/pub/pdf/Fcc93.pdf.

In addition to the abolition of parole, a major cause of the increase in time served by federal prisoners, also resulting from the Sentencing Reform Act, was mandatory minimum sentences. *See, e.g.*, 18 U.S.C. § 924(c) (five year mandatory sentence enhancement for using or carrying a gun during a crime of violence or a drug crime), § 924(e) (mandatory fifteen-year sentence for possession of a firearm by a person with three state or federal convictions for a violent felony or a serious drug offense).

[20] *See* U.S. Dept. of Justice, Bureau of Justice Statistics, *Federal Justice Statistics, 2012-Statistical Tables*, Table 7.11 (Jan. 2015), bjs.gov/content/pub/pdf/fjs12st.pdf.

[21] Portillo has been in custody since his arrest in 2017, and thus has fifty-two years remaining on his sentence. He estimates a release date in 2064 when he will be sixty-three, apparently assuming that his prison conduct will be unblemished, entitling him to a reduction for the maximum possible number of days of good time credits.

would have an incentive to obtain an education, participate in rehabilitative programs, and just possibly demonstrate, at some point in the future, that he has matured beyond the seemingly incorrigible person of his youth to become an adult whom parole authorities might reasonably think should be permitted to rejoin society.[22]

Portillo's sentence illustrates the unfortunate consequences of eliminating parole. Nevertheless, it is a sentence that a conscientious District Judge concluded was appropriate, and one that, upon review, we affirm.

We have considered the remainder of Portillo's arguments and find them to be without merit. Accordingly, the judgment of the District Court is AFFIRMED.

---

[22] Ruling in *Montgomery* that *Miller*'s prohibition of a mandatory life sentence without parole, imposed on a juvenile, applied retroactively, the Supreme Court stated, "The opportunity for release will be afforded to those who demonstrate the truth of *Miller*'s central intuition—that children who commit even heinous crimes are capable of change." 136 S. Ct. at 736.