**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────

**No. 20-4129**

─────────

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

PHILIP BERNARD FRIEND,

Defendant - Appellant.

─────────

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond.  Henry E. Hudson, Senior District Judge.  (3:99-cr-00201-HEH-RCY-4)

─────────

Argued:  March 11, 2021                    Decided:  June 28, 2021

─────────

Before WILKINSON, FLOYD, and RICHARDSON, Circuit Judges.

─────────

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Richardson joined. Judge Floyd wrote a dissenting opinion.

─────────

**ARGUED:**  Robert James Wagner, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Richmond, Virginia, for Appellant.  Richard Daniel Cooke, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee.  **ON BRIEF:**  Geremy C. Kamens, Federal Public Defender, Alexandria, Virginia, Joseph S. Camden, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Richmond, Virginia, for Appellant.  G. Zachary Terwilliger, United States Attorney, Alexandria, Virginia, Brian R. Hood, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee.

WILKINSON, Circuit Judge:

Appellant Philip Friend, who actively participated as a fifteen-year-old juvenile in a series of violent carjackings, challenges the fifty-two-year sentence imposed by the district court after a remand in this case. Our remand instructed the district court to give a more thorough explanation for its sentence, with the prospect that a more tempered sentence might also result. *United States v. Friend*, 755 F. App'x 234 (4th Cir. 2018). These things have now both come to pass. The offenses in question occurred long ago, but their consequences have been long lasting. Because the district court acted within its discretion in imposing the present sentence, we affirm.

## I.

### A.

The relevant facts are undisputed. In 1999, at the age of fifteen, Philip Friend and several other associates and family members perpetrated a series of carjackings, beatings, and murders in Virginia. Philip worked primarily with his mother, his older brother Travis (then-age nineteen), and his older brother Eugene (then-age twenty-seven). The crime spree began as Eugene's brainchild; the family plotted to steal a long-haul truck and use it to ship marijuana from Texas. The family members specifically chose to target "older, independent truckers because they perceived them as more vulnerable and less likely to have their disappearances generate immediate attention." J.A. 238–39.

The family murdered its first victim, Soren Cornforth, in Richmond, Virginia, on March 1, 1999. Cornforth had just promised his wife that he would retire from long-haul trucking when the Friend family attacked him. J.A. 527. Philip and Eugene entered

2

Cornforth's truck and beat him while the driver was waiting overnight to deliver his cargo. J.A. 370–71. Cornforth fought back more vigorously than expected, so Travis, at Eugene's direction, shot Cornforth dead. J.A. 371, 407. The group fled without taking Cornforth's truck, fearing the gunshots would soon attract the police, but it took several of his personal possessions. J.A. 371. When Philip exited Cornforth's truck, he had blood on his hands, jeans, and shirt. J.A. 402.

The family attacked its second victim, John Wesley Cummings, forty days later on April 10, 1999. J.A. 232. Posing as prostitutes, Philip's mother and Eugene's girlfriend attempted to lure Cummings to a van where Eugene and Philip lay in wait. After Cummings rejected the women's offer, Eugene and Philip assaulted Cummings in his truck. For several hours, Eugene and Philip (with the rest of the family following behind in the van) used Cummings' truck to sell stolen goods while holding Cummings captive. Eugene drove the truck, and Philip bound Cummings' arms, legs, mouth, and nose with duct tape. Philip then beat Cummings with his fists and a BB gun and kicked him. He "threatened to kill Cummings by freezing him to death in [the] refrigerator unit in his trailer," and told him, "This is the end of your journey." *Id*. Eugene pulled the truck over to stop Philip's beating of Cummings at one point. J.A. 204, 214.

The family used the truck to sell a stolen trailer of logs and also took several of Cummings' personal items. Philip specifically demanded Cummings' money and the rings he wore. J.A. 232–33, 662. The family then abandoned the truck with Cummings inside, although they slightly loosened his bindings. J.A. 273. As they fled, Philip "threatened to

3

spray the truck with gunfire if Cummings tried to look out of the truck to see his assailants." J.A. 662. Philip later wore the rings he stole from Cummings. *Id.*

The original trial judge determined that "it was fortuitous . . . that Eugene Friend intervened or perhaps Mr. Cummings would [have died]" from Philip's attack. J.A. 204. The beating caused Cummings to suffer from "frequent dizziness, headaches, constant pain," "partial loss of sight in his left eye," and "total loss of hearing in his right ear." J.A. 662. Subsequently, Cummings was forced to retire early. He declared bankruptcy, and lost his livelihood, his home, and the companionship of his spouse. J.A. 568, 662.

Finally, about two weeks later, on April 25, 1999, the family attacked and killed Samuel Lam. J.A. 273–74. In preparation, Philip recruited an additional associate who had a 10mm Smith and Wesson handgun. J.A. 663. Eugene and Travis supplied ski masks and gloves. *Id.* Philip's mother and Eugene's girlfriend enticed Lam to pull over at a rest stop. The three then agreed to travel to a nearby hotel for sex. When Lam arrived and approached the van, Philip "attempted to grab him and pull him into the van, but Mr. Lam was able to break away." J.A. 274. Philip and three others exited to attack Lam, and Eugene knocked him unconscious. *Id.*

Philip bound Lam's feet and arms with duct tape and covered his head with a pillowcase. J.A. 664. He then beat and kicked Lam so severely that the pillowcase and truck cabin were covered in blood. *Id.* The brothers drove the truck about an hour to a secluded pond as Philip beat Lam. They arrived at a swampy area, and Lam begged for his life as Philip helped his brothers drag him to the water. Travis shot Lam seven times. However, these shots did not immediately kill Lam, so Eugene attempted to choke and

4

drown him. Lam then escaped Eugene's grasp, but he "was only able to move to another part of the swamp, where the group heard him moaning." *Id.* The brothers then left him to die. His remains were not discovered until almost a year later, on April 13, 2000. J.A. 665.

The family later sold the goods from Lam's truck. Defendant and his two brothers drove to Texas but failed to locate any marijuana to sell. Eventually they settled on a load of carrots but were stopped in Georgia on their return trip home due to various traffic violations. J.A. 275.

After his brothers' arrests but before his own indictment, Philip attempted to intimidate a potential witness who had bought one of the stolen items from Lam's truck. He "cornered" the woman in a grocery store and "attempted to hit her because he believed she was talking with federal authorities regarding the arrest of his brothers." J.A. 44. He told her, "you and your son are going to die for snitching," and followed her out of the store as he continued to harass her. *Id.* The potential witness had to return to the store for safety; only once her brother arrived to help did Philip leave. *Id.*

B.

On May 3, 2000, defendant pleaded guilty to one count of carjacking, in violation of 18 U.S.C. § 2119(1), and one count of carjacking resulting in death, in violation of 18 U.S.C. § 2119(3). On October 24, 2000, the Honorable Robert E. Payne sentenced defendant to 180-months' imprisonment for his § 2119(1) conviction and life imprisonment without parole for his § 2119(3) conviction pursuant to the then-mandatory sentencing Guidelines. J.A. 218–19.

5

After multiple attempts at postconviction relief, this court granted defendant's petition challenging the imposition of a life sentence under *Miller v. Alabama*, 567 U.S. 460 (2012), which held that mandatory life-without-parole sentences for juvenile offenders violated the Eighth Amendment, and *Montgomery v. Louisiana*, 577 U.S. 190 (2016), which made *Miller* retroactively applicable to cases on collateral review. *See In re Friend*, No. 13–292 (4th Cir. July 1, 2014) (unpublished order); *United States v. Friend*, 667 F. App'x 826 (4th Cir. 2016) (per curiam).

Upon remand, Philip appeared before the Honorable Henry E. Hudson in 2017 for resentencing. The sentencing proceeding was a thorough one. Defendant's aunt and Dr. Gillian Blair—a "clinical[,] forensic, and developmental psychologist," J.A. 443—testified to Philip's challenging childhood. He suffered physical abuse at the hands of his father and older brothers. At age nine, Philip lost his father to cancer. His father's death exacerbated the family's financial troubles and his mother's ongoing struggles with depression and bipolar disorder. J.A. 461–63. Following his father's death, Philip's older brothers became the de facto heads of the household and continued to abuse Philip, including by choking and beating him. Dr. Blair concluded that this "environment of child abuse and neglect . . . would impact every aspect of [Philip's] being." J.A. 464.

Dr. Blair also explained how the human brain is not fully developed before the age of twenty-five—in particular, the frontal and prefrontal cortex are "not yet fully mature," leading adolescents to be "impulsive" and to inaccurately "assess risk." J.A. 452–53. She noted that the counseling session to which his mother took Philip would not have been enough to truly combat the struggles he faced. J.A. 460–61. Finally, she detailed her

6

evaluation of Philip, which considered his "11 or 12" juvenile arrests, J.A. 465, and several IQ, executive functioning, and psychological tests, but did not include a risk assessment of future violence or criminality. J.A. 468–71, 569. She found Philip did not currently suffer from "any emotional disturbances or psychotic disorders," J.A. 471, and she agreed that "his age at the time of the offenses, as well as the dysfunction in the household, played a role in his involvement in this offense." J.A. 465–66.

As for Philip's conduct in prison since his original sentencing in 2000, Jack Donson—a former Bureau of Prisons official—testified that Philip was an "exemplary model of rehabilitation." J.A. 516. He detailed Philip's efforts at completing vocational and therapeutic programs, and that unlike many other inmates, he had not succumbed to gang recruitment or violence. Moreover, his work history demonstrated that he was generally trusted by prison officials. J.A. 517 (noting inmates, like defendant, who work in the safety department are "usually handpick[ed]").

Finally, the court heard from family members of the victims. The wife of Soren Cornforth explained the emotional toll of her husband's murder, J.A. 538 ("When the person you love more than life is murdered, you shatter."), and the experience of having to revisit this traumatic period eighteen years later, J.A. 531 ("[I]t has ripped this scab off of my heart and off of my soul. And this rage and this anger is still there."). Cornforth's daughter mourned the fact that before his death, her father had just started having the time to enjoy being a grandfather to her children. J.A. 541. Cornforth's son noted the recovery process was never complete; even two decades later, "we have families that are obviously still not doing well from this." J.A. 543. Samuel Lam's son testified about his father's

7

sacrifice as a truck driver. He worked to ensure his sons could go to college after he immigrated to the U.S. from Hong Kong in the 1960s. J.A. 561–62. He echoed Cornforth's son as he explained, "the impact of this crime was extremely devastating to our family, and it is a nightmare that still affects us to this day." J.A. 560.

After reviewing the evidence and testimony, the court imposed a sentence of sixty-five-years' imprisonment. J.A. 579. The court's discussion spanned approximately two pages of transcript and focused almost exclusively on detailing the horrific nature of the offenses. In particular, it barely mentioned and failed to weigh defendant's age at the time of the offenses. *See* J.A. 577–79.

Philip appealed, and this court vacated the sentence after argument, finding that the district court's explanation was insufficient. *United States v. Friend*, 755 F. App'x 234 (4th Cir. 2018) (per curiam). In particular, the court found the district court's "statement explaining its sentence did not adequately address the fact that Philip was 15 years old when he committed the offenses, that he would have had trouble getting away from the influence of his family, and that, consequently, he was less blameworthy than his older brothers who came up with this criminal scheme and committed the killings." *Id*. at 238.

C.

The case returned to Judge Hudson for resentencing on January 30, 2020. The proceeding incorporated the evidence and testimony presented at the 2017 resentencing, and the defense presented one additional expert and one summary witness. Professor Julie McConnell, a law professor at the University of Richmond School of Law and former prosecutor and public defender, canvassed the post-*Miller* resentencings of juvenile

8

offenders. J.A. 779–94. The professor's comparison of Philip's case to other *Miller* resentencings characterized defendant as a "secondary offender" because he was not the "triggerman." J.A. 797. The court questioned this classification during her presentation. J.A. 796–97 ("[F]rom what I have read he had a very participatory role. . . . [I]n one case he beat unmercifully a truck driver begging for his life. The man is crippled for the rest of his life.").

Dr. Sarah Vinson, an expert in adult and pediatric psychiatry, reaffirmed much of Dr. Blair's 2017 testimony regarding the juvenile brain's incomplete development and reduced ability to consider consequences. She also testified about the effects on children of substance abuse and trauma—which she defined as "anything that undermines someone's sense of safety and security." J.A. 741. She stated that the abuse Philip suffered and his family's instability (including his father's substance abuse, his mother's ongoing mental health struggles, and his father's premature death) exacerbated his inability to consider consequences and extricate himself from criminal influences. Moreover, in her recent interview of him, she assessed his "risk factors" for future violence, J.A. 762, saw signs of improvement, and believed he had an "excellent capacity for rehabilitation," J.A. 771. However, she did not perform tests designed to assess defendant's future dangerousness if released. J.A. 761–63. The court also asked questions throughout Dr. Vinson's testimony. *See* J.A. 764, 771.

The parties presented their arguments on sentencing; the defense requested a sentence of thirty years, J.A. 818, and the government recommended sixty-five years, J.A. 658. Finally, the court invited Philip to speak on his own behalf. Defendant stated that he

took "full responsibility for [his] actions" and highlighted his good conduct while incarcerated. J.A. 819–23.

The court then explained and imposed a sentence of fifty-two-years' imprisonment—its discussion this time spanning roughly ten pages of transcript. J.A. 823–32. The court began by explaining the nature of this court's remand and its instructions for the court "to acknowledge, and amplify, the weight it gave the testimony of several defense witnesses who addressed the defendant's upbringing, adjustment to a custodial environment, maturity, and likelihood of recidivism," and "to consider what type of sentences other individuals had received who have had their sentences reduced." J.A. 823. The judge accepted the 2000 presentence investigation report and 2017 addendum without objection, and noted that the defense and government agreed that the properly calculated sentencing Guidelines advised a life sentence. J.A. 823–24.

The judge continued by referencing the "vicious" nature of the crimes and the impact on the victims' families. J.A. 824 ("[T]he families of the victims have emotional scars that will never heal, and voids in their life that will never be filled."). He then proceeded to summarize his view of the evidence presented at the 2017 resentencing, including: the victim impact statements, Philip's difficult upbringing and its impacts, adolescents' lack of full development and "mature judgment," and Philip's prison record and conduct as explained by Mr. Donson. J.A. 824–28; *see also* J.A. 819 (court noting that Philip had "matured some" and it would give him "some credit for that"). The court noted that although "not fully articulated during the June 2017 sentencing hearing," the above

10

information "was the evidentiary basis for the 780-month sentence imposed at that time." J.A. 828.

Next, the judge discussed the additional testimony and evidence presented by the defense. In Dr. Vinson's view, he noted, defendant had "an excellent capacity for rehabilitation." J.A. 829. And he commended Professor McConnell's testimony regarding other courts' post-*Miller* resentencings for juvenile offenders as "informative," while acknowledging its limitations as "each of those cases have unique circumstances, backgrounds, and varying degrees of involvement on the part of the defendant." *Id*. The court found Professor McConnell's label of "secondary" a "little bit of a misnomer" considering "the extent of this defendant's involvement." *Id*. An additional "important" factor was that Philip's co-defendants had received life without parole for their participation. J.A. 830.

Moving to the testimony regarding Philip's most recent conduct while incarcerated, the court explained that the "difficult task presently before this Court is balancing the defendant's behavior and attitude while confined, with the extremely violent nature of the offenses for which he stands convicted." *Id*. The court found defendant's "adjustment to a custodial setting . . . impressive." *Id*. But the "impact on the victims' families" and "gravity of these offenses"—in particular defendant's "active participation in torturing and murdering two individuals, and viciously maiming a third"—weighed "very heavily." *Id*. As to Philip's age at the time of the crimes, the court noted that the original life sentence was unconstitutional and "inappropriate on the record before the Court." J.A. 830–31.

11

Finally, the court acknowledged the Sentencing Guidelines as advisory only and noted its review of the § 3553(a) factors, the expert recommendations, and the transcripts of the prior sentencings. J.A. 831. The court explained that it had "considered the nature and circumstances of the offenses, the role of each participant, and the sentences given to the co-defendants. I have weighed the defendant's upbringing, his age at the time the offenses occurred in determining what type of sentence would promote respect for the law, provide for deterrence, provide just punishment and protect the community." *Id.* It noted that its judgment had been "tempered a bit by the presentation" of the post-*Miller* sentencings, which was a "major factor." *Id.* Ultimately, in considering all of the evidence and § 3553 sentencing factors, the court found a sentence of fifty-two-years' imprisonment—thirteen years shorter than the previous sixty-five-year sentence—was just. J.A. 832.

II.

Defendant now appeals his sentence, first arguing that its imposition violates the Eighth Amendment. The Eighth Amendment states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. In *Miller v. Alabama*, the Supreme Court held that "mandatory life without parole for those under the age of 18 at the time of their crimes" violates the prohibition on "cruel and unusual punishments." 567 U.S. 460, 465 (2012). The court explained that juveniles "'are more vulnerable . . . to negative influences and outside pressures,' including from their family and peers," due to their "limited 'contro[l] over their own environment'" and inability "to extricate themselves from horrific, crime-producing settings." *Id.* at 471

12

(quoting *Roper v. Simmons*, 543 U.S. 551, 569 (2005)). A mandatory life sentence, the Court reasoned, precluded the individualized inquiry that sentencing requires. In particular, it did not allow sentencing courts the opportunity to consider the "hallmark features" of juvenility; the juvenile's "family and home environment"; "the circumstances of the homicide offense, including the extent of [a defendant's] participation in the conduct"; "the way familial and peer pressures may have affected him"; and "the possibility of rehabilitation." *Id.* at 477–78.

Four years later, the court held that *Miller* applied retroactively to cases on collateral review. *Montgomery v. Louisiana*, 577 U.S. 190, 212 (2016). There the court explained that "a juvenile convicted of a homicide offense could not be sentenced to life in prison without parole absent consideration of the juvenile's special circumstances in light of the principles and purposes of juvenile sentencing." *Id.* at 193–94.

Defendant contends that his term-of-years sentence violates these dictates. The Court recently clarified that a "discretionary sentencing system is both constitutionally necessary and constitutionally sufficient" under *Miller* and *Montgomery*. *Jones v. Mississippi*, 141 S. Ct. 1307, 1313 (2021). In *Jones*, the Court found that the juvenile offender's life-without-parole sentence was constitutional because "the sentence was not mandatory and the trial judge had discretion to impose a lesser punishment in light of Jones's youth." *Id.* at 1322. Such is the case here. Defendant was not sentenced pursuant to a mandatory sentencing scheme. The district court varied downward from the *advisory* Guidelines sentence of life imprisonment. It exercised its discretion by reducing

13

defendant's sentence twenty percent from its 2017 sentence of sixty-five-years' imprisonment.

Moreover, defendant's Eighth Amendment challenge is unavailing for a second reason. Defendant was not sentenced to life without parole. He was sentenced to fifty-two-years' imprisonment and is currently set to be released at age sixty. *See* Appellee Br. at 31 (noting projected release date as November 5, 2043).

We are not persuaded by defendant's further argument that his sentence—while not pronounced as a life sentence—amounts to a *de facto* life sentence. Other courts have found that a lengthy term of years need not equate to a life sentence without parole. *See United States v. Sparks*, 941 F.3d 748, 754 (5th Cir. 2019) ("Given *Miller*'s endorsement of 'a lengthy term of years' as a constitutional alternative to life without parole, it would be bizarre to read *Miller* as somehow foreclosing such sentences."); *Bunch v. Smith*, 685 F.3d 546, 550, 553 (6th Cir. 2012). We agree that lengthy sentences are not ipso facto life sentences but acknowledge that a court could impose a sentence that is so long as to equate to a life sentence without parole. *See, e.g.*, *McKinley v. Butler*, 809 F.3d 908, 913–14 (7th Cir. 2016) (vacating 100-year sentence); *Moore v. Biter*, 725 F.3d 1184, 1191–92 (9th Cir. 2013) (vacating 254-year sentence).

However, we need not draw here the murky line of how long is too long. Even assuming that the reasoning of *Miller* and *Montgomery* extends to term-of-years sentences, defendant's sentence clearly does not equate to life imprisonment. His sentence sets his release from confinement in his sixties, which as the district court noted, allows him "a limited period of freedom." J.A. 831. Such a term is similar to sentences upheld by our

14

sister circuits. *See, e.g., United States v. Portillo*, 981 F.3d 181, 187 (2d Cir. 2020) (upholding sentence that would release a fifteen-year-old offender when he is seventy-one years old).

Finally, the defendant's sentence was thoroughly individualized. The district court imposed defendant's sentence after a detailed discussion, which analyzed the § 3553(a) factors—including the impact of Philip's youth and circumstances as outlined by *Miller* and *Montgomery*. J.A. 823–32; *see also Jones*, 141 S. Ct. at 1316. The punishment in short was carefully tailored to defendant himself, and we find no Eighth Amendment violation in it.

III.

Defendant next contends that his sentence is procedurally and substantively unreasonable. We review all sentences for "reasonableness" by applying the "deferential abuse-of-discretion standard." *United States v. McCain*, 974 F.3d 506, 515 (4th Cir. 2020) (internal quotation marks and citations omitted).

Our inquiry proceeds in two steps. We first "ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." *Gall v. United States*, 552 U.S. 38, 51 (2007). Only if we determine that the sentence is procedurally reasonable do we then proceed to substantive reasonableness by considering "the totality of the circumstances." *Id.* In a post-*Miller* resentencing, this includes "the many ways that 'children are constitutionally different

15

from adults for purposes of sentencing.'" *McCain*, 974 F.3d at 515 (quoting *Miller*, 567 U.S. at 471) (upholding a life sentence for a permanently incorrigible juvenile offender as procedurally and substantively reasonable).

A.

Defendant argues that his sentence is procedurally unreasonable because the district court did not adequately explain the reasons for its sentence and "focused exclusively on the seriousness of the offense." Appellant Br. at 29. We reject both arguments because the district court sufficiently engaged with defendant's non-frivolous arguments for a reduced sentence in its lengthy discussion, and it is not impermissible in an appropriate case for a sentencing court to place "great weight" on a single factor. *See United States v. Pauley*, 511 F.3d 468, 476 (4th Cir. 2007).

The district court's sentencing explanation need not be "exhaustive," *United States v. Avila*, 770 F.3d 1100, 1107 (4th Cir. 2014), or "robotically tick" through the § 3553(a) factors, *United States v. Johnson*, 445 F.3d 339, 345 (4th Cir. 2006). But the court's explanation "must be sufficient to satisfy the appellate court that the district court has considered the parties' arguments and has a reasoned basis for exercising its own legal decisionmaking authority." *Avila*, 770 F.3d at 1107–08 (internal quotation marks and alterations omitted). This includes addressing all of the defendant's "non-frivolous arguments in favor of a downward departure from the sentencing range." *United States v. Blue*, 877 F.3d 513, 516, 519 (4th Cir. 2017) (vacating for procedural error where district court addressed two arguments and left six unaddressed).

16

Our previous remand also influences our review. On remand from vacating defendant's sixty-five-year sentence as procedurally unreasonable, we instructed the district court to be "clearer about how it weighed" defendant's age at the time of the offense against the "terribly brutal nature of the crimes." *Friend*, 755 F. App'x at 238. Thus, we also review the current sentence for conformity to our mandate.

Defendant argues, as we have noted, that his sentence is procedurally unreasonable because the district court focused solely on the horrific nature of the crimes committed. Of course, this was a permissible factor for the district court to consider—the § 3553(a) factors expressly instruct a district court to weigh "the nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1), and "the need for the sentence imposed to reflect the seriousness of the offense," *id.* § 3553(a)(2)(A). Indeed, given the gruesome nature of the defendant's crimes here, it would be astonishing if the trial court did not place considerable emphasis upon them. The defendant's crimes were not simply horrific in their details; they devastated three families. Defendant contends, however, that the court's emphasis amounted to an exclusive fixation, which ignored the remaining factors and defendant's non-frivolous arguments. A review of the record, however, demonstrates that the district court did not improperly fixate on this one § 3553(a) factor and instead demonstrates that it "considered the parties' arguments and ha[d] a reasoned basis for exercising [its] own legal decisionmaking authority." *Rita v. United States*, 551 U.S. 338, 356 (2007).

In its explanation, which spanned over ten transcript pages, the district court discussed each of defendant's mitigating arguments. As to the "history and circumstances of the defendant," 18 U.S.C. § 3553(a)(1), it began its discussion by acknowledging

17

Philip's acceptance of responsibility and apologies to the victims' families. J.A. 823. It also noted that Philip's age made a term of life imprisonment unconstitutional and inappropriate. J.A. 830–31. The court summarized and accepted Dr. Blair's and Dr. Vinson's testimony on Philip's psychological condition and his difficulty extricating himself from his family's influence. J.A. 826–29. However, as it noted: "Dr. Blair did not diagnose the defendant with any emotional or psychiatric disorders, and concluded that he exhibited no symptoms of such disorders. She also acknowledged that she did not address his risk of future violence or criminality." J.A. 827. The district court was also clear that it gave defendant "some credit" for his maturation in prison, as evidenced by his exemplary record and voluntary participation in courses and workshops. J.A. 827–28 (noting Donson's description of defendant as an "exemplary model of rehabilitation").

Finally, the court addressed defendant's argument regarding the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). But the court also acknowledged that the usefulness of comparisons is limited when "each of those cases have unique circumstances, backgrounds, and varying degrees of involvement on the part of the defendant." J.A. 829. It expressed its hesitancy to treat defendant as a "secondary offender" purely because he did not pull the trigger. J.A. 829–30; *see also* J.A. 807 ("I'm just pointing out I don't want the words 'secondary offender' to indicate that he played a subordinate role, because he was a major figure in these offenses.").

On the other side of the scale, the district court highlighted the brutal nature of the carjackings and murders. *See* 18 U.S.C. § 3553(a)(2)(A). While Philip's age and his

18

family's negative influence certainly made him less culpable, his "active" participation included binding and beating the victims as they begged for mercy, and beating one victim so viciously he maimed him for life. J.A. 825, 830. In fact, that victim's life was likely only spared due to his older brother's intervention. Philip's recruitment of an additional associate in the Lam murder and his threatening of a witness in a grocery store demonstrated that he was not merely a remote accessory but actively brought about these victims' suffering. As the court summarized: "Even though other family members undoubtedly influenced the defendant's behavior, the evidence revealed that he was not simply a passive bystander, but a willing, active participant, knowing his actions would have tragic consequences." J.A. 825; *see also* J.A. 830. It also highlighted the terrible toll the defendant's crimes had taken on both the victim who survived and the deceased victims' family members. J.A. 830.

Finally, the district court considered the need for defendant's sentence to "promote respect for law and provide for deterrence" and to "reflect the nature and circumstances of this offense." J.A. 832; *see also* 18 U.SC. § 3553(a)(2). Ultimately, as we have noted, the court's consideration of defendant's numerous mitigating arguments and balancing of the offense's seriousness and its impact on the victims resulted in a twenty percent reduction of defendant's sentence. J.A. 831–32.

This lengthy and detailed discussion is a far cry from the abbreviated explanation at the 2017 resentencing. *Compare* J.A. 823–32 (2020 resentencing), *with* J.A. 577–79 (2017 resentencing). In that resentencing, while the court appropriately acknowledged the Guidelines as advisory and the § 3553(a) factors, its discussion was quite short and

19

eschewed wrestling with defendant's non-frivolous arguments. *See Blue*, 877 F.3d at 519. The court failed even to acknowledge defendant's juvenile status at the time of the offenses. *See* J.A. 578. That is not the case here. As chronicled above, the court considered this factor throughout its explanation and included in its review of Dr. Blair's and Dr. Vinson's testimony a discussion of the special considerations of juvenile offenders. J.A. 825 ("[O]ther family members undoubtedly influenced the defendant's behavior . . . ."); J.A. 825–29 (discussion of expert testimony); J.A. 830–31 ("Given his age at the time that these crimes were committed, a sentence of life is constitutionally impermissible, and in this view, inappropriate on the record before the Court.").

But to sum it up, it is clearly permissible for a sentencing court to weigh the gravity of the offense or the "impact a defendant's crimes have had on a community and to vindicate that community's interest in justice." *United States v. Guglielmi*, 929 F.2d 1001, 1006 (4th Cir. 1991), *superseded by statute on other grounds as recognized in United States v. Pridgen*, 64 F.3d 147, 149 n.3 (4th Cir. 1995). That after all, is the reason a defendant is before the court. An *exclusive* focus on one factor impermissibly vitiates the requisite individualized consideration. *Id.* at 1006–07 (vacating sentence as procedurally unreasonable when district court's discussion "mere[ly] reemphasi[zed]" the seriousness of the offense and did not acknowledge numerous non-frivolous arguments). On the other hand, for appellate courts to micromanage sentencings and demand a district court assign equal weight to each § 3553(a) factor would also disregard a sentencing's individualized inquiry and toss our deferential abuse-of-discretion review to the winds. *United States v. Fowler*, 948 F.3d 663, 672 (4th Cir. 2020). Ultimately, defendant's disagreement with the

20

district court's weighing of the sentencing factors is not enough to find the sentence procedurally unreasonable. *McCain*, 974 F.3d at 517 (describing courts' "extremely broad discretion in this regard" (internal quotation marks and citation omitted)).

B.

Finding the sentence procedurally reasonable, we next turn to its substantive reasonableness, "taking into account the totality of the circumstances including the extent of any variance from the Guidelines range." *Avila*, 770 F.3d at 1103 (internal quotation marks and citations omitted). In reviewing, we may "reverse a sentence *only* if it is unreasonable, even if the sentence would not have been the choice of the appellate court." *McCain*, 974 F.3d at 518 (internal quotation marks and citations omitted). The Court has emphasized the "fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court." *Gall*, 552 U.S. at 51. Such a deferential standard of review is advisable because the sentencing court "sees and hears the evidence, makes credibility determinations, has full knowledge of the facts and gains insights not conveyed by the record." *Id*.

Here the district court imposed a sentence many years below the advisory Guidelines range, which allows us to "presume that [the] chosen sentence is substantively reasonable." *Avila*, 770 F.3d at 1103 (quoting *United States v. Mendoza-Mendoza,* 597 F.3d 212, 216 (4th Cir.2010)); *see also United States v. Barraza*, 982 F.3d 1106, 1116 (8th Cir. 2020) (finding juvenile defendant's fifty-year, below-Guidelines sentence substantively reasonable partly because a "sentence below or within the Guidelines range

is presumptively reasonable on appeal"). Defendant does not rebut this presumption of reasonableness.

As noted above, the district court did not abuse its discretion by placing significant weight on the seriousness of defendant's offense, and we cannot say that the court's weighing was unreasonable in this case. *See Fowler*, 948 F.3d at 672 (noting that "there was nothing remotely unreasonable" in district court finding that "the gravity of [defendant's] conduct and its life-shattering consequences" outweighed the other factors). There are crimes whose consequences vividly outlive the criminal act. While society may be ready to "move on," the bonds forged by the human family may make it impossible for loved ones to do so. The enduring harms defendant inflicted on the victims and their families have been detailed and need not be repeated here. Suffice it to say that it was clearly permissible for the district court to take them into account under § 3553(a)(2) in determining the appropriate punishment.

Good process often promotes good outcomes. Procedural reasonableness often leads to sounder substantive conclusions. Defendant's mitigating arguments tempered the district court's sentence, ultimately resulting in a thirteen-year reduction from the 2017 resentencing. The court gave defendant "credit" for the maturity he displayed in prison. J.A. 819. It also weighed the fact that defendant's family "undoubtedly influenced [his] behavior," J.A. 825, defendant's age at the time of the offenses, J.A. 830–31, and defendant's acceptance of responsibility, J.A. 823. In particular, the defense's presentation of other *Miller* resentencings was a "major factor" in the sentence. J.A. 831; *see also* 18 U.S.C. § 3553(a)(6).

22

Defendant again contends that the court did not reasonably weigh this factor, pointing to other post-*Miller* resentencings in which shorter lengths of imprisonment were imposed. But there are always variations in sentencing, which is a quintessentially fact-specific and multifaceted exercise. *See* 18 U.S.C. § 3553(a)(6) (noting the "need to avoid *unwarranted* sentence disparities among defendants with similar records who have been found guilty of similar conduct" (emphasis added)). Not every variation is *unwarranted*. "Courts have repeatedly made clear that comparisons of sentences may be treacherous because each sentencing proceeding is inescapably individualized." *United States v. Rivera-Santana*, 668 F.3d 95, 105 (4th Cir. 2012).

Moreover, the supposed disparity is not as pronounced as defendant proclaims. The Eighth Circuit recently upheld a post-*Miller* fifty-year resentence for an offender who was sixteen years old at the time he and an "adult friend" kidnapped, raped, and killed a mother and her son. *Barraza*, 982 F.3d at 1116–17. Such a sentence was reasonable even though the district court was "impressed" with the defendant's "institutional adjustment and successful completion of courses." *Id.* at 1111 (internal quotation marks omitted). And the Second Circuit, "[a]cknowledging the broad scope of a sentencing judge's discretion," concluded that a fifty-five-year sentence imposed on a defendant—who, at the age of fifteen and in one criminal episode, perpetrated four murders with several other gang members—was "not unreasonable in any legally cognizable sense." *Portillo*, 981 F.3d at 184–85. The defendant's fifty-two-year sentence is not the lone outlier that defendant claims.

IV.

To find this sentence unreasonable would displace the discretion that district judges possess in setting sentences. We are a court of appellate review, not a panel of appellate sentencers. District courts are granted exceptional discretion in sentencing for a reason. They view the full criminal tableau first-hand, and they weigh the conflicting evidence and competing arguments. Their choices are not easy. When a court abuses its discretion, it is this court's duty to correct the error. But when a district court is responsive to our mandates and reasonably exercises its sentencing power, we must respect its judgment. So we do here. The judgment is

*AFFIRMED.*

FLOYD, Circuit Judge, dissenting:

At the age of fifteen, Philip Bernard Friend and various members of his family committed a series of extremely serious crimes. Nobody disputes the severity of those offenses or the irreparable harm that Philip visited upon the lives of his victims and their families. But this appeal tests the legality of the district court's imposition of a fifty-two-year sentence on a juvenile offender. Today, the majority declares Philip's half-century sentence procedurally and substantively reasonable. Because I cannot agree with the majority's conclusion on either score, I respectfully dissent.

## I.

## A.

The last time this case was before us, we determined that the district court failed to sufficiently explain the sixty-five-year sentence it imposed on Philip at the first resentencing hearing. The district court's work fell short because it did not "adequately address the fact that Philip was 15 years old when he committed the offenses, that he would have had trouble getting away from the influence of his family, and that, consequently, he was less blameworthy than his older brothers who came up with this criminal scheme and committed the killings." *United States v. Friend*, 755 F. App'x 234, 238 (4th Cir. 2018) (per curiam). Because the district court "should have been clearer about how it weighed" the severity of Philip's crimes against his age and vulnerability at the time he committed the offenses, Philip's sixty-five-year sentence was procedurally unreasonable. *Id.* We therefore vacated and remanded for resentencing, "leav[ing] the imposition of a sentence" to the district court on remand "after the court has had the opportunity to address [Philip's]

25

arguments and explicitly weigh them against the admitted gravity of the various offenses."
*Id.*

On remand, Philip advanced four arguments in support of a lower sentence than the one recommended by the Guidelines (life in prison) and the government (sixty-five years): (1) that he was a juvenile when he committed the crimes; (2) that his learning disability and traumatic childhood blunted his ability to make reasoned decisions; (3) that he was susceptible to influence from his family members, including his older brothers; and (4) that he did not personally commit the killings. Philip's arguments tracked the Supreme Court's recognition that children are differently situated from adults for sentencing purposes. *See Miller v. Alabama*, 567 U.S. 460, 471 (2012) (explaining that "juveniles have diminished culpability and greater prospects for reform," which makes them "less deserving of the most severe punishments" (quoting *Graham v. Florida*, 560 U.S. 48, 68 (2010))).

To support his arguments, Philip called a psychologist as a witness, who opined that it would have been "functionally impossible" for Philip to remove himself from his family's influence in light of his age and childhood trauma. J.A. 750. Philip also tendered a comparison of federal juvenile offenders resentenced under *Miller*, including their ages, the relevant facts giving rise to their convictions, their post-offense conduct, and their original sentences. And he called a law professor to explain the methodology of the comparison cases. Based on his arguments and accompanying evidence, Philip sought a thirty-year sentence.

In light of the nonfrivolous nature of Philip's arguments, the district court was required to explicitly address each argument and explain its reasons for rejecting it "in a

sufficiently detailed manner to allow this Court to conduct meaningful appellate review." *United States v. Blue*, 877 F.3d 513, 519 (4th Cir. 2017). This is especially true when, as here, the complexity of the case and the circumstances demand a lengthy explanation. *See id.* at 518 ("The adequacy of the sentencing court's explanation depends on the complexity of each case."); *see also Rita v. United States*, 551 U.S. 338, 356 (2007) ("The appropriateness of brevity or length, conciseness or detail, when to write, what to say, depends upon circumstances.").

The district court's explanation fell short of that standard. The district court began by noting the "brutal[]" nature of the offenses and "the horrific torture visited on the victims." J.A. 825. The court explained that Philip's "family members undoubtedly influenced [his] behavior," but that, in its view, Philip "was . . . a willing, active participant, knowing his actions would have tragic consequences." *Id.* The court also acknowledged that Philip was "17 years old when sentenced in 2000." *Id.*

The court then summarized the witness testimony from the first and second resentencing hearings. With respect to Philip's *Miller* comparison cases, the court found them "informative," but noted that the cases involved "unique circumstances, backgrounds, and varying degrees of involvement on the part of the defendant." J.A. 829. The court also acknowledged Philip's "impressive" behavior in prison and described his "prospects of . . . living a crime-free life" as "favorable." J.A. 830. It then defined the "difficult task" before it as "balancing the defendant's behavior and attitude while confined, with the extremely violent nature of the offenses for which he stands convicted." J.A. 830.

The court thereafter turned to the Guidelines. In light of Philip's "age at the time these crimes were committed," the court acknowledged that a Guidelines sentence of life imprisonment "is constitutionally impermissible." *Id.* The court then indicated that it had "exhaustively reviewed all the factors" set forth in 18 U.S.C. § 3553(a) and that it had considered Philip's "upbringing" and "age at the time the offenses occurred." J.A. 831. Although its "judgment [was] tempered a bit . . . [by the] type of sentences other judges have given in post-*Miller* sentencings"—which it described as a "major factor" in its decision—the court announced that a fifty-two-year sentence was appropriate in light of the circumstances. J.A. 831–32.

In my view, the district court's explanation does not amount to sufficient engagement with each of Philip's nonfrivolous arguments for a lower sentence. As we have held, "a perfunctory recitation of the defendant's arguments . . . 'does not demonstrate reasoned decisionmaking or provide an adequate basis for appellate review.'" *Blue*, 877 F.3d at 518 (quoting *United States v. Carter*, 564 F.3d 325, 329 (4th Cir. 2009)). Notably absent from the district court's sentencing analysis is any individualized assessment of each of Philip's nonfrivolous arguments for a lower sentence.

The district court's explanation therefore plainly violates "the law of this circuit," which requires a district court to "address or consider *all* non-frivolous reasons presented for imposing a different sentence and explain why [it] has rejected those arguments." *United States v. Ross*, 912 F.3d 740, 744 (4th Cir. 2019) (emphasis added). In other words, sentencing courts must take up each nonfrivolous argument advanced by a defendant and

28

explain "whether and why" it found those arguments unpersuasive. *Blue*, 877 F.3d at 519. A "passing reference" to an argument will not do. *See id*.

Charitably read, the transcript from the second resentencing hearing indicates that the district court assessed and explained its reasons for rejecting only *one* of Philip's four arguments: that he was acting under his family's influence, which was difficult for him to escape. *See* J.A. 825 ("Even though other family members undoubtedly influenced the defendant's behavior, the evidence revealed that he was not simply a passive bystander, but a willing, active participant, knowing his actions would have tragic consequences."). As to Philip's remaining arguments, we are left to "speculate as to the reason[s]" why they did not carry the day. *See Ross*, 912 F.3d at 745.

True, at various points in the course of pronouncing Philip's sentence, the district court stressed the severity of Philip's crimes and their tragic consequences for the victims. But the court never did so as part of its assessment or analysis of Philip's arguments for a lower sentence. *Cf. United States v. McCain*, 974 F.3d 506, 515–16 (4th Cir. 2020) (finding a juvenile defendant's sentence procedurally reasonable when the district court conducted a "thorough multiday sentencing hearing" and "carefully described the parties' contentions as they pertained to each of the Section 3553(a) factors and *Miller* factors"). And we simply may not "fill in the gap in the district court's explanation with a 'guess' as to how that court might have assessed the defendant's non-frivolous arguments." *United States v. Webb*, 965 F.3d 262, 271 (4th Cir. 2020) (quoting *Blue*, 877 F.3d at 521).

Not to worry, says the majority: the district court's second attempt to explain Philip's sentence "is a far cry from the abbreviated explanation at the 2017 resentencing."

29

Majority Op. at 19. But the district court's relatively improved explanation at the second resentencing hearing cannot suffice to cure its shortcomings.

To be sure, we owe substantial deference to district courts in the sentencing context. But we must always insist that district courts adhere to our procedural requirements. And when district courts fall short of those requirements, we must say so. We owe nothing less to the defendants before us and to the public at large. *See Gall v. United States*, 552 U.S. 38, 50 (2007) (noting that district courts "must adequately explain the chosen sentence . . . to promote the perception of fair sentencing"). This is particularly true when district courts sentence juvenile offenders, who differ from adults in critical ways that bear on the rationale underlying our sentencing laws. *See Roper v. Simmons*, 543 U.S. 551, 569–70 (2005) (describing "[t]hree general differences between juveniles under 18 and adults," including "a lack of maturity and an underdeveloped sense of responsibility," a sense of "vulnerab[ility] or susceptib[ility] to negative influences and outside pressures," and a character that "is not as well formed" (cleaned up)).

For the foregoing reasons, I would vacate Philip's sentence and remand for the district court to carefully assess each of Philip's nonfrivolous arguments for a lower sentence.

### B.

Because I would hold that Philip's sentence is procedurally unreasonable, I would not reach the substantive reasonableness of his sentence. *See Carter*, 564 F.3d at 328 ("If, and only if, we find the sentence procedurally reasonable can we 'consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard.'" (quoting

*Gall*, 552 U.S. at 51)). I will not spill much ink here, but I am troubled by the length of Philip's sentence and the majority's decision to bless it as substantively reasonable.

Taking a familiar tack, the majority supports its substantive reasonableness holding by explaining that Philip's sentence amounts to "a thirteen-year reduction from the 2017 resentencing." Majority Op. at 22. But the extent of the reduction from the first resentencing hearing tells us nothing about the substantive reasonableness of the sentence before us now. Although Philip's below-Guidelines sentence carries a presumption of reasonableness, he can rebut that presumption by showing "that the sentence is unreasonable when measured against the [18 U.S.C.] § 3553(a) factors." *United States v. Montes-Pineda*, 445 F.3d 375, 379 (4th Cir. 2006) (quoting *United States v. Sharp*, 436 F.3d 730, 738 (7th Cir. 2006)). Philip raises several arguments based on the § 3553(a) factors, but his disparity argument is particularly compelling.

Relying on the *Miller* comparison cases provided to the district court, Philip contends that his sentence is substantively unreasonable because it produces an "unwarranted sentence disparit[y]" compared to "defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). He accurately points out that his sentence is among the highest of any corrigible defendant resentenced in federal court under *Miller*. Indeed, it is higher than defendants who, for example, murdered five children by firebombing, *United States v. Jefferson*, 816 F.3d 1016, 1019–21 (8th Cir. 2016) (fifty years), or committed stabbings and attempted murder while incarcerated, *United States v. Sparks*, 941 F.3d 748, 755 (5th Cir. 2019) (thirty-five years).

31

The majority warns that "[c]ourts have repeatedly made clear that comparisons of sentences may be treacherous because each sentencing proceeding is inescapably individualized." Majority Op. at 23 (quoting *United States v. Rivera-Santana*, 668 F.3d 95, 105 (4th Cir. 2012)). But the Guidelines were created to reduce disparities and explicitly direct sentencing courts to fashion sentences with that goal in mind. *See* 18 U.S.C. § 3553(a)(6). To my mind, Philip's fifty-two-year sentence is an outlier among similarly situated, corrigible juvenile offenders.

The majority also suggests that Philip's sentence is permissible because "[n]ot every variation is *unwarranted*." Majority Op. at 23. I am deeply troubled by this logic, particularly given that neither the majority nor the district court explains why Philip's high sentence was indeed warranted. I therefore cannot agree with the decision to find Philip's sentence substantively reasonable.

## II.

I agree with the majority that "[g]ood process often promotes good outcomes." Majority Op. at 22. Respectfully, I do not believe that Philip received either. I would therefore vacate Philip's sentence and remand for resentencing, with instructions for the district court to assess each of Philip's nonfrivolous arguments for a lower sentence.